

# FILED

SEP 1 7 2020

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____,DEPUTY

# UNITED STATES DISTRICT COURT
## FOR THE
## WESTERN DISTRICT OF OKLAHOMA

CASE NO.  CIV-20-944-D

DWAIN EDWARD THOMAS,

*Plaintiff,*

v.

KEVIN STITT, Governor; STEVEN BICKLEY, Executive Director, OKLAHOMA
PARDON AND PAROLE BOARD; T. HASTINGS SIEGFRIED, Chair, OKLAHOMA
BOARD OF CORRECTIONS; SCOTT CROW, Director, OKLAHOMA
DEPARTMENT OF CORRECTIONS,

*Defendants.*

# CIVIL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# —JURY TRIAL DEMAND—

> **Dwain Edward Thomas, #253218**
> **129 Conner Rd.**
> **Hominy, OK 74035**
> **(918) 594-1300**
>
> *Plaintiff Pro se*

September 15, 2020

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... i

PARTIES, JURISDICTION AND VENUE ...................................................... 1

NATURE OF THE CASE ................................................................................... 6

FACTUAL ALLEGATIONS .............................................................................. 10

I.   YOUTH HAVE DIMINISHED CULPABILITY AND GREATER PROSPECTS FOR REFORM THAN ADULTS AND THE STATE CANNOT, EXCEPT IN THE RAREST OF CASES, CONDEMN YOUNG OFFENDERS TO DIE IN PRISON WITHOUT A MEANINGFUL AND REALISTIC OPPORTUNITY FOR RELEASE ................................................................................................... 10

   A. Cases of the USSC establish that youth are different from adults in ways that diminish the penological justifications for the harshest punishments ............................................................................................ 10

   B. As a result of these differences, the USSC has forbidden LWOP as unconstitutionally disproportionate punishment for all but the rarest of youth who demonstrate "irreparable corruption." ................................. 12

   C. For those who are not "irreparably corrupt," there must be a meaningful and realistic opportunity to obtain release, and Oklahoma's parole system fails to meet this standard ............................. 13

II.  OKLAHOMA'S POLICIES AND PRACTICES SUBJECT MR. THOMAS TO UNCONSTITUTIONALLY DISPROPORTIONATE PUNISH-MENT BY DENYING A MEANINGFUL AND REALISTIC OPPORTUNITY FOR RELEASE REGARDLESS OF INDIVIDUAL MERIT ........................................... 16

   A. Overview of how Oklahoma violates Mr. Thomas' Constitutional rights ............................................................................................................ 16

   B. Oklahoma mandates life (i.e., "imprisonment for the natural life of the offender") sentences for juveniles who's crimes do not reflect irreparable corruption ................................................................................ 18

   C. Oklahoma's parole scheme operates as a system of clemency that fails to afford Mr. Thomas and those similarly situated a meaningful and realistic opportunity for release upon demonstrated maturity and rehabilitation .............................................................................................. 20

1. The Governor's clemency authority is exclusive and devoid of standards. ................................................................................................ 20

2. PPB policies and practices, combined with the scheme of executive clemency, deny Mr. Thomas and those similarly situated a meaningful and realistic opportunity for release. ..................................................... 22

3. DOC policies automatically deny Mr. Thomas, as well as those similarly situated, rehabilitative opportunities that affect his opportunity for release. .............................................................................. 25

III. THE ORIGINS AND EFFECTS OF OKLAHOMA'S SYSTEM OF *DE FACTO* LIFE WITHOUT PAROLE. ..................................................... 29

IV. MR. THOMAS' RIGHTS HAVE BEEN VIOLATED AND HE SUFFERS GRAVE HARMS AS A RESULT OF OKLAHOMA'S SYSTEM OF *DE FACTO* LIFE WITHOUT PAROLE. ........................................... 31

CAUSES OF ACTION

COUNT ONE:

Violation of the Eighth Amendment Prohibition Against Cruel and Unusual Punishment and 42 U.S.C. § 1983 ......................................................... 35

COUNT TWO:

Violation of Article II, Section 9, Oklahoma Constitution's Prohibition Against Cruel or Unusual Punishment ................................................................ 36

COUNT THREE:

For Declaratory Judgment that Oklahoma Statute Title 57, Section 332.7 is Unconstitutional ................................................................................................ 38

PRAYER FOR RELIEF ........................................................................................... 38

CERTIFICATE OF SERVICE

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) DWAIN EDWARD THOMAS, <br><br> *Plaintiff,* <br><br> v. <br><br> (1) KEVIN STITT, Governor, <br><br> (2) STEVEN BICKLEY, Executive Director, OKLAHOMA PARDON AND PAROLE BOARD, <br><br> (3) T. HASTINGS SIEGFRIED, Chair, OKLAHOMA BOARD OF CORRECTIONS <br><br> (4) SCOTT CROW, Director, OKLAHOMA DEPARTMENT OF CORRECTIONS <br><br> *Defendants.* | No. _____ <br><br> **JURY TRIAL DEMAND** |

**COMES NOW**, Dwain Edward Thomas, Plaintiff *pro se* herein, submits the instant Complaint for Declaratory and Injunctive Relief ("Complaint") and states:

## PARTIES, JURISDICTION AND VENUE

1.     **Plaintiff:** DWAIN EDWARD THOMAS, #253218, is an inmate in the custody of the Oklahoma Department of Corrections ("DOC") confined in the Dick Conner Correctional Center penal facility located at 129 Conner Road in Hominy, Oklahoma 74035, and has been a resident of the State of Oklahoma for thirty-four (34) years. Mr. Thomas was convicted in the District Court of Sequoyah County, State of Oklahoma, on March 20, 1997, of Count-I: Murder in the First Degree ("Murder") in violation of 21 O.S.1994, § 701.7(A); Count-II: Murder in violation of 21 O.S.1994, §

-1-

701.7(A); and, Count-III: Murder in violation of 21 O.S.1994, §701.7(A), in a case styled *State of Oklahoma v. Thomas*, No. CF-1995-380A (Seq. Cty. Dist. Ct.). Mr. Thomas, who was a fifteen (15) year old juvenile, was subsequently sentenced to Life imprisonment on all three Counts without adequate consideration of youth status. The District Court ordered Petitioner to serve Counts I and II concurrently, and Counts II and III consecutively. While incarcerated, Mr. Thomas has maintained Level IV since 2003, and has maintained an "Outstanding" evaluation average for his Monthly Inmate Evaluation Time Credit Report, receiving a fifty (50)-point score average[1]. He currently and for the past eighteen (18) years works as a technician for the facility maintenance department. Additionally, Mr. Thomas has completed/achieved: EPA Certification; Residential Electrician's Assistant; Commercial/Industrial Electrician's Assistant; Motor Vehicle Air Conditioning Refrigerant Recovery and Recycling Equipment under Section 609 of the Federal Clean Air Act; Heating, Ventilation, and Air Conditioning (HVAC Technician, Refrigeration Technician; Module I (Licensed Trades Academy); two (2) Six (6)-Month Participation in Licensed Trades Academy; Mechanical Journeyman License; Biblical Interpretation through The Center for Advanced Studies at Crossroad Bible Institute; Lexington Skills Center Mechanical Code Training to the IMC, IFGC &IRC; CEU's Credit for Mechanical Codes; and, Paralegal Certification from Blackstone Career Institute. Mr. Thomas has been injured by the acts and policies of the defendants in the manner set forth below.

---

[1] Level IV is the highest privilege level an inmate may achieve in accordance with Operations Procedure ("OP")-060107. An "Outstanding" rating is achieved by receiving an evaluation of forty-five (45) to fifty (50) points, and is the highest evaluation an inmate may receive under DOC's Monthly Inmate Evaluation Time Credit Report in accordance with OP-060211.

2.      **Defendant:** KEVIN STITT is the Governor of the State of Oklahoma and in his official capacity was working under color of State law when the allegations arose. *West v. Atkins*, 487 U.S. 42 (1988). Governor Stitt is a resident of the State of Oklahoma. In his capacity as Governor, Stitt appoints five of the nine members of the Oklahoma Board of Corrections ("BOC"), which is the governing Board of the DOC, and appoints three of the five members of the Oklahoma Pardon and Parole Board ("PPB"). In his capacity as Governor, Stitt decides whether individuals serving parole-eligible life sentences will be paroled, as well as whether any individual will receive a grant of executive clemency. Governor Stitt is sued in his official capacity.

3.      **Defendant:** STEVEN BICKLEY is the Executive Director of the PPB and in his official capacity was working under color of State law when the allegations arose. *West v. Atkins*, 487 U.S. 42 (1988). Mr. Bickley is a resident of the State of Oklahoma. The PPB makes recommendation regarding parole and commutation for individuals serving life sentences. The PPB's operations are governed by constitution, statute, and regulation. There are five members. Three members are appointed by the Governor, one member is appointed by the Chief Justice of the Oklahoma Supreme Court, and one member is appointed by the presiding judge of the Oklahoma Court of Criminal Appeals. The appointed members hold their office coterminous with the Governor. Members conduct parole hearings and make determinations about whether particular individuals will be recommended for parole and/or commutation, as well as making decisions about intermediate steps such as programmatic requirements. As Executive Director, Mr. Bickley exercises ultimate authority—in consultation with the Governor and other members—with respect to the PPB's policies,

practices, and procedures. Mr. Bickley is the primary policy maker, spokesperson, and administrator for the PPB, as well as the primary liaison between the PPB and the Governor. Mr. Bickley is sued in his official capacity as Executive Director of the PPB.

4.     **Defendant:** T. HASTINGS SIEGFRIED chairs the BOC and in his official capacity was working under color of State law when the allegations arose. *West v. Atkins*, 487 U.S. 42 (1988). Mr. Siegfried is a resident of the State of Oklahoma. The BOC is the governing board of the DOC. There are nine members. Five members are appointed by the Governor, two members are appointed by the Speaker of the House of Representatives, and two members are appointed by the President Pro Tempore of the Senate. The appointed members serve at the pleasure of his or her appointing authority. The BOC establishes policies for the operation of the DOC. The BOC also establishes and maintains such institutions as are necessary or convenient for the operation of programs for the education, training, vocational education and rehabilitation of prisoners under the jurisdiction of the DOC. In his capacity as Chair, Mr. Siegfried exercises ultimate authority—in consultation with the Governor, other members, and the Director of the DOC—with respect to the BOC's policies, practices, and procedures. Mr. Siegfried is the primary policy maker, spokesperson, and administrator for the BOC, as well as the primary liaison between the BOC and the Director of the DOC. Mr. Siegfried is sued in his official capacity as Chair of the BOC.

5.     **Defendant:** SCOTT CROW is the Director of the DOC and in his official capacity was working under color of State law when the allegations arose. *West v. Atkins*, 487 U.S. 42 (1988). Mr. Crow is a resident of the State of Oklahoma. The Director is appointed

by the BOC with the advice and consent of the Senate. As Director, Mr. Crow reports only to Defendant Siegfried. In his capacity as Director, Mr. Crow is responsible, among other things, for managing the state-operated prisons in which prisoners serving life sentences are housed and for the education, training, vocational education, rehabilitation and recreation of prisoners under the jurisdiction of the DOC, as well as the transfer of prisoners from one penal institution to another, including how individuals are assigned to any particular security status or facility. As Director, Mr. Crow is also responsible for making investigations and inquiries as to prisoners at the penal institution who is to be, or who might be, considered for parole or other clemency. Also as Director, Mr. Crow is responsible for the development and operation, subject to the policies and guidelines of the BOC, of work-release centers, community treatment facilities, or prerelease programs. Mr. Crow is the ultimate decision-making authority on an individual's classification, access to programs, and determinations about whether or not the DOC will honor a recommendation for programming or security change from the PPB. Mr. Crow is sued in his official capacity as Director of the DOC.

6.      This cause of action is brought under 42 U.S.C. § 1983 with this Court having subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over state law claims asserted. Additionally, this Court has jurisdiction under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

7.      Venue is proper under 28 U.S.C. § 1391(b) as the conduct out of which this action arose occurred in this District.

## NATURE OF THE CASE

8.     This challenge is brought by Mr. Thomas; an inmate who was sentenced to three (3) "imprisonment for life" ("Life") sentences in state court for acts committed when he was a juvenile, without appropriate consideration of his youth and its attendant characteristics. Mr. Thomas has been, and continues to be, denied a meaningful and realistic opportunity for release, in violation of the Eight Amendment to the U.S. Constitution and Article II, Section 9 of the Oklahoma Constitution.

9.     The United States Supreme Court ("USSC"), in a series of decisions, has forbidden as unconstitutional imprisonment of life without parole ("LWOP")—or its equivalent—for all juveniles but the "rare juvenile whose crime reflects irreparable corruption" and declared this substantive constitutional rule retroactive. *Montgomery v. Louisiana*, 136 S.Ct. 718 (2016) ("*Montgomery*") (quoting *Miller v. Alabama*, 132 S.Ct. 2455, 2469 (2012)); *Graham v. Florida*, 560 U.S. 48, 82 (2010) ("*Graham*").

10.     The USSC has found that young people are constitutionally different from adults for the purpose of sentencing due to three distinctive attributes of youth that mitigate their culpability: transient immaturity; vulnerability to external forces; and character traits that are still being formed. *Montgomery*, 136 S.Ct. at 73; *Miller v. Alabama*, 132 S.Ct. 2455, 2464 (2012) ("*Miller*"); *Graham*, 560 U.S. at 68; *Roper v. Simmons*, 543 U.S. 551, 569-570 (2005) ("*Roper*").

11.     The "penological justifications for life without parole collapse in light of 'the distinctive attributes of youth,'" rendering LWOP an unconstitutionally "disproportionate"

punishment as to "all but the rarest of juvenile offenders, whose crimes reflect permanent incorrigibility." *Montgomery*, 136 S.Ct. at 734-735.

12.     Accordingly, the USSC has forbidden as unconstitutional LWOP sentences—or its equivalent—for youth who have committed non-homicide offenses (*Graham*), and for any youth whose homicide crime reflects "unfortunate yet transient immaturity." *Montgomery*, 136 S.Ct. at 734 (quoting *Miller*, 132 S.Ct. at 2465). The cases establish that only in the "rarest" cases of "irreparable corruption" will such a penalty be appropriate. Thus, by definition, criminal sentencing schemes that *mandate* Life fail to allow adequate consideration of youth to make this assessment. *Id.* at 733; *Miller*, 132 S.Ct. at 2469.

13.     The USSC defines "life without parole" as a sentence of Life that denies an individual a "meaningful" and "realistic" opportunity for release upon demonstrated maturity and rehabilitation. *Graham*, 560 U.S. at 75, 82; *Miller*, 132 S.Ct. at 2469. The USSC has expressly rejected executive clemency as affording such opportunity. *Graham*, 560 U.S. at 70 (citing *Solem v. Helm*, 463 U.S. 277, 300-301 (1983)).

14.     Together, these decisions establish that the Eight Amendment forbids a statutory scheme that (i) imposes Life sentences upon minors without appropriate consideration of their distinctive attributes as youth, and then (ii) fails to provide them a meaningful and realistic opportunity for release. Oklahoma law fails this test on both accounts.

15.     In Oklahoma, many individuals, including Mr. Thomas, are serving Life sentences for offenses committed as juveniles. Mr. Thomas was sentenced under Oklahoma's mandatory sentencing scheme, which requires judges to impose Life sentences

in cases of Murder without adequate consideration of youth to determine whether an individual is among the rare minors whose offense reflects "irreparable corruption." Mr. Thomas is serving three (3) Life sentence that are, theoretically, parole-eligible.

16.     Mr. Thomas has now served more than twenty (20) years upon his *first* Life sentence and has made admirable progress to demonstrate his maturity and rehabilitation. Yet, no matter the level of maturity or rehabilitation—or lack thereof—Mr. Thomas may demonstrate, he is denied parole due to the "aggravating factors associated with the original crime."

17.     As a matter of Oklahoma law, the authority to parole any person sentenced to Life lies exclusively in the hands of the Governor. Thus, rather than affording Mr. Thomas a meaningful and realistic opportunity for release, Oklahoma's parole scheme functions as a system of *ad hoc* executive clemency in which grants of release are exceptionally rare, are governed by no substantive, enforceable standards, and are masked from view by blanket assertions of executive privilege. Furthermore, Defendants lack policies that protect the constitutional rights of Mr. Thomas, and similarly situated juveniles sentenced to Life, to a meaningful and realistic opportunity for release; rely upon risk assessment tools to make recommendations about release that discriminate against those who were minors at the time of offense; and prohibit youth from progressing through the Oklahoma Department of Corrections ("DOC") system to demonstrate their rehabilitation.

18.     As a result of these practices, Mr. Thomas, as well as others similarly situated, who has matured, who has done everything within his power to reform and to demonstrate his rehabilitation, and who the USSC says deserves an opportunity for a second chance to

-8-

live outside prison walls, is far more likely to die in Oklahoma's prison than ever to receive a second chance. Mr. Thomas' sentences have been converted into *de facto* LWOP sentences by virtue of the denial of a meaningful and realistic opportunity for release.

19.     In this respect, the Oklahoma parole system violates the state and federal constitutions as applied to individuals serving Life sentences for offenses committed as youth, and subjects them to unconstitutionally disproportionate punishment.

20.     Plaintiff is an individual who was sentenced to consecutive Life sentences for an offense committed as a juvenile without adequate consideration of his youth, who has been incarcerated for decades, who has matured and demonstrated his rehabilitation during his incarceration through his behavior and institutional accomplishments, but who is nonetheless denied any fair opportunity for release by the defendants.

21.     Defendants are state officials responsible for Oklahoma policies and practices that deny Mr. Thomas, as well as others similarly situated, the requisite meaningful and realistic opportunity for release, thus converting his Life sentences to *de facto* LWOP sentences without regard for his youth.

22.     This lawsuit seeks declaratory and injunctive relief (i) to declare unconstitutional Oklahoma's parole process to the extent that it fails to provide adequate consideration of youth status, (ii) to remedy Oklahoma's unconstitutional failure to provide a meaningful and realistic opportunity for release to Mr. Thomas, as well as others similarly situated, and (iii) to provide relief for Mr. Thomas who received neither adequate consideration of his youth at sentencing nor any meaningful and realistic opportunity for

release over the decades since, resulting in grossly disproportionate punishment in violation of the Eighth Amendment and Article II, § 9 of the Oklahoma Constitution.

## FACTUAL ALLEGATIONS

I. **YOUTH HAVE DIMINISHED CULPABILITY AND GREATER PROSPECTS FOR REFORM THAN ADULTS AND THE STATE CANNOT, EXCEPT IN THE RAREST OF CASES, CONDEMN YOUNG OFFENDERS TO DIE IN PRISON WITHOUT A MEANINGFUL AND REALISTIC OPPORTUNITY FOR RELEASE.**

A. CASES OF THE USSC ESTABLISH THAT YOUTH ARE DIFFERENT FROM ADULTS IN WAYS THAT DIMINISH THE PENOLOGICAL JUSTIFICATIONS FOR THE HARSHEST PUNISHMENTS.

23.     A series of USSC decisions have established that "children are constitutionally different from adults for purposes of sentencing." *Montgomery*, 136 S.Ct. at 733 (quoting *Miller*, 132 S.Ct. at 2464 (citing *Roper*, 543 U.S. at 569-570; *Graham*, 560 U.S. at 68 (2015))).

24.     "These differences result from children's diminished culpability and greater prospects for reform, and are apparent in three primary ways." *Id.* (internal quotation marks and citations omitted).

25.     "First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. *Id.* (internal quotation marks and citations omitted).

26.     "Second, children are more vulnerable to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings." *Id.* (internal quotation marks and citations omitted).

27.     "And third, a child's character is not as well-formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity." *Id.* (internal quotation marks and citations omitted).

28.     "The Eighth Amendment's prohibition of cruel and unusual punishment guarantees individuals the right not to be subjected to excessive sanctions. That right … flows from the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense." *Miller*, 132 S.Ct. at 2463 (internal quotation marks and citations omitted).

29.     A LWOP sentence—or the functional equivalent—"'means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days.'" *Graham*, 560 U.S. at 70 (quoting *Naovarath v. State*, 105 Nev. 525, 526, 779 P.2d 944 (1989)) (parenthetical original).

30.     "[T]he penological justification for life without parole collapse in light of 'the distinctive attributes of youth.'" *Montgomery*, 136 S.Ct. at 734 (quoting *Miller*, 132 S.Ct. at 2465).

31.     "Because retribution 'relates to an offender's blame-worthiness, the case for retribution is not as strong with a minor as with an adult.'" *Id.* at 733 (quoting *Miller*, 132 S.Ct. at 2465).

32.     "The deterrence rationale likewise does not suffice, since 'the same characteristics that render juveniles less culpable than adults—their immaturity, recklessness,

and impetuosity—make them less likely to consider potential punishment.'" *Id.* (quoting *Miller*, 132 S.Ct. at 2465).

33.    "The need for incapacitation is lessened, too, because ordinary adolescent development diminishes the likelihood that a juvenile offender 'forever will be a danger to society.'" *Id.* (quoting *Miller*, 132 S.Ct. at 2465).

34.    "Rehabilitation cannot justify the sentence, as life without parole 'foreswears altogether the rehabilitative ideal.'" *Id.* (quoting *Miller*, 132 S.Ct. at 2465).

35.    Thus, "the characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate" to juvenile offenders' culpability for crimes they commit, and this in violation of the Eighth Amendment's prohibition against grossly excessive punishment. *Miller*, 132 S.Ct. at 2465-66.

**B. AS A RESULT OF THESE DIFFERENCES, THE USSC HAS FORBIDDEN LWOP AS UNCONSTITUTIONALLY DISPROPORTIONATE PUNISHMENT FOR ALL BUT THE RAREST OF YOUTH WHO DEMONSTRATE "IRREPARABLE CORRUPTION."**

36.    In 2010, the USSC banned LWOP sentences for juvenile offenders in non-homicide cases as unconstitutionally disproportionate punishment that violates the Eight Amendment. *Graham*, 560 U.S. at 82.

37.    In 2012, the USSC prohibited mandatory LWOP for juvenile offenders in homicide cases as unconstitutionally disproportionate punishment that violates the Eighth Amendment. *Miller*, 132 S.Ct. at 2475. It requires sentencing courts to "consider a child's 'diminished culpability and heightened capacity for change' before condemning him or her to die in prison[,]" and to "take into account 'how juveniles are different, and how those

differences counsel against irrevocably sentencing them to a lifetime in prison.'" *Montgomery*, 136 S.Ct. at 726, 733 (quoting *Miller*, 132 S.Ct. at 2460, 2469, respectively).

38.     "Because *Miller* determined that sentencing a child to life without parole is excessive for all but the rarest juvenile offender whose crime reflects irreparable corruption, it rendered life without parole an unconstitutional penalty for a class of defendants because of their status—that is, juvenile offenders whose crimes reflect the transient immaturity of youth." *Id.* at 734 (internal quotation marks and citations omitted).

39.     In 2016, the USSC ruled that *Miller* announced a substantive rule of constitutional law and was therefore retroactive. *Id.* at 736.

40.     "[A] lifetime in prison is a disproportionate sentence for all but the rarest of juveniles, those whose crimes reflect 'irreparable corruption.'" *Id.* at 726 (quoting *Miller*, 132 S.Ct. at 2469; *Roper*, 543 U.S. at 573).

41.     "*Miller* made clear that 'appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.'" *Id.* at 733-734.

42.     "*Miller's* conclusion that the sentence of life without parole is disproportionate for the vast majority of juvenile offenders raises a grave risk that many are being held in violation of the Constitution." *Id.* at 736.

### C. FOR THOSE WHO ARE NOT "IRREPARABLY CORRUPT," THERE MUST BE A MEANINGFUL AND REALISTIC OPPORTUNITY TO OBTAIN RELEASE, AND OKLAHOMA'S PAROLE SYSTEM FAILS TO MEET THIS STANDARD.

43.     The Eighth Amendment forbids for all but the rarest juveniles a "sentence [that] guarantees he will die in prison without any meaningful opportunity to obtain release, no matter what he might do to demonstrate that the bad acts he committed as a teenager are

not representative of his true character, even if he spends the next half century attempting to atone for his crimes and learn from his mistakes." *Graham*, 560 U.S. at 79.

44.    To avoid this unconstitutionally disproportionate punishment for juveniles, the state must provide 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" *Miller*, 132 S.Ct. at 2469 (quoting *Graham*, 560 U.S. at 75).

45.    "The 'remote possibility' of [executive clemency] does not mitigate the harshness of the [LWOP] sentence." *Graham*, 560 U.S. at 70 (citing *Solem v. Helm*, 463 U.S. 277, 300-301 (1983)) (parenthetical added).

46.    The differences between clemency and parole were explained in *Solem v. Helm*, 463 U.S. 277, 300-301 (1983) ("*Solem*"):

> "As a matter of law, parole and commutation are different concepts, despite some surface similarities. Parole is a regular part of the rehabilitative process. *Assuming good behavior, it is the normal expectation in the vast majority of cases.* The law generally specifies when a prisoner will be eligible to be considered for parole, and details the standards and procedures applicable at that time. Thus it is possible to predict, at least to some extent, when parole might be granted. Commutation, on the other hand, is an *ad hoc* exercise of executive clemency. A Governor may commute a sentence at any time for any reason without reference to any standards."

(Citations omitted and emphasis added).

47.    In Oklahoma, as a matter of law, the authority to parole any person sentenced to Life upon conviction of a "violent" crime lies exclusively in the hands of the Governor. Thus, rather than affording Mr. Thomas and those similarly situated a meaningful and realistic opportunity for release, Oklahoma's parole scheme functions as a system of *ad hoc* clemency in which grants of release are exceptionally rare, are governed by no substantive,

enforceable standards, and are masked from view by blanket assertions of executive privilege.

48.    "Allowing [juvenile] offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Montgomery*, 136 S.Ct. at 736.

49.    Mr. Thomas "must be given the opportunity to show [his] crime did not reflect irreparable corruption; and, if it did not, [his] hope for some years of life outside prison walls must be restored." *Id.* at 736-737.

50.    "Maturity can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation. A young person who knows that he or she has no [expectation other than to die in] prison ... has little incentive to become a responsible individual." *Graham*, 560 U.S. at 79 (alteration added).

51.    "In some prisons, moreover, the system itself becomes complicit in the lack of development. ... [I]t is the policy in some prisons to withhold counseling, education, and rehabilitation programs for those who are ineligible for parole consideration. A categorical rule against [LWOP] for juvenile nonhomicide offenders avoids the perverse consequence in which the lack of maturity that led to an offender's crime is reinforced by the prison term." *Id.* (cross-reference omitted).

52.    The USSC has determined that, at least, the following evidence is relevant to the issue of *rehabilitation* of juveniles sentenced to LWOP *or its equivalent*: whether the juvenile was a "troubled, misguided youth;" whether the juvenile offender has become "a model

member of the prison community;" whether the juvenile offender participates in programs and is a "trainer and coach;" and whether the juvenile offender offers "advice and serve[s] as a role model to other inmates." *Montgomery*, 136 S.Ct. 736.

## II. OKLAHOMA'S POLICIES AND PRACTICES SUBJECT MR. THOMAS TO UNCONSTITUTIONALLY DISPROPORTIONATE PUNISHMENT BY DENYING A MEANINGFUL AND REALISTIC OPPORTUNITY FOR RELEASE REGARDLESS OF INDIVIDUAL MERIT.

### A. OVERVIEW OF HOW OKLAHOMA VIOLATES MR. THOMAS' CONSTITUTIONAL RIGHTS.

53.    Oklahoma's current practices guarantee that Mr. Thomas and those similarly situated—whose sentences encompass a theoretical opportunity for parole—will die in prison no matter how thoroughly he has been reformed, all without adequate consideration of his youth status.

54.    Currently, and at the time of Mr. Thomas' conviction, Oklahoma law permits Life sentences for youth in certain non-homicide cases, *see, e.g.*, 21 O.S.Supp.1987, § 832(B), and mandates Life sentences in all cases of Murder. 21 O.S.Supp.1987, § 701.9(A). In practice, for decades the State has denied those sentenced under this law any meaningful opportunity for release on parole regardless of demonstrated rehabilitation. This violates the rights of Mr. Thomas under the Eighth Amendment and Article II, § 9.

55.    Although Oklahoma law describes Life sentences as "parole-eligible," in practice Mr. Thomas will never be paroled, regardless of his demonstrated maturity, rehabilitation, or other individual aspects of his record. As of the date of this filing, Mr. Thomas has never been recommended for parole, irrespective of his maturity and rehabilitation efforts as he matured into adulthood, or his readiness for release.

56.     Oklahoma's parole scheme is a system of parole in name only. In all significant respects, it is an *ad hoc* system of executive clemency in which opportunities for release are all but non-existent. It fails to afford Mr. Thomas and those similarly situated to a meaningful and realistic opportunity for release upon demonstrated maturity and/or rehabilitation.

57.     As a matter of law, the authority to parole Mr. Thomas is exclusively in the hands of the Governor without any transparency, constraints, standards, or mechanisms for review and without regard for an individual's juvenile status at time of offense.

58.     Moreover, the state's parole policies and practices make no distinction between youth and adults, fail to adequately consider the attributes of youth, and rely upon risk assessment tools that penalize those who were young at the time of offense, all while fundamentally impeding individuals from vindicating their rights to a meaningful opportunity for release.

59.     By categorically barring those sentenced to Life, including juveniles, from progression to security classifications within DOC below medium, Oklahoma denies opportunities to progress through the DOC system to demonstrate their maturity and rehabilitation, in violation of the Eighth Amendment and Article II, § 9.

60.     By operating a scheme in which the only opportunity for release is *ad hoc* and unreviewable executive clemency, devoid of standards, by which it is nearly impossible to actually obtain release regardless of individual merit, Oklahoma policies and practices convert Life sentences into *de facto* LWOP sentences. As applied to Mr. Thomas, as well as

those similarly situated, this subjects him to unconstitutionally disproportionate punishment in violation of the Eighth Amendment and Article II, § 9.

### B. Oklahoma Mandates Life (*i.e.*, "Imprisonment for the Natural Life of the Offender") Sentences for Juveniles Who's Crimes Do Not Reflect Irreparable Corruption.

61.     Mr. Thomas, as well as those similarly situated, is serving Life sentences in Oklahoma that purport to be parole-eligible.

62.     Just as with Mr. Thomas, many of the juveniles were sentenced under a mandatory sentencing scheme that requires judges to impose Life sentences in any case of Murder regardless of a person's juvenile status. 21 O.S., § 701.9(A). Judges may also impose LWOP. *Id.*

63.     As a matter of law, and at the time of Mr. Thomas' conviction, a conviction of Murder and subsequent punishment of "imprisonment for Life," as prescribed in 21 O.S., § 701.9(A), ensures that Mr. Thomas spends the remainder of his natural life in the custody of the DOC. Under Oklahoma law, it has been long held that "a life sentence in Oklahoma is simply that—a convicted offender is to be detained in DOC's custody *for the remainder of his or her natural life.*" *See Landes v. McCollum*, Not Reported in F.Supp.3d, 2014 WL 6455483 at *2 (W.D. Okla. 2014) (emphasis added). "[P]arole is discretionary under Oklahoma law and…the term of a sentence of life imprisonment in [Oklahoma] is, as outlined above, *the duration of the prisoner's natural life.*" *Id.* at *3 (emphasis added).

64.     Also as a matter of law, in Oklahoma, there is no protectable liberty interest in parole. *See Shabazz v. Keating*, 1999 OK 26, 977 P.2d 1089, 1093; *and see Shirley v. Chestnut*, 603 F.2d 805, 807 (10th Cir. 1979) (explaining that parole in Oklahoma is discretionary). Thus,

under Oklahoma law, Mr. Thomas does not "have a liberty interest in receiving **meaningful consideration** for parole." *See Vue v. Henke*, 746 Fed. Appx. 780, 782-783 (10th Cir. 2018) (emphasis added).

65.     Judges may also impose Life or LWOP as punishment for certain non-homicide offenses as well. *See, e.g.*, 21 O.S. §§ 51.1, 51.1a, and 888.

66.     There is no minimum age for being charged with Murder or receiving a mandatory Life sentence in Oklahoma, and there is no minimum age for being charged with and receiving a LWOP sentence for a non-homicide crime. Additionally, under Oklahoma law gives judges absolute discretion in deciding whether or not sentences are to be served concurrently or consecutively with any other sentence. *See* 22 O.S., § 976.

67.     At the time of Mr. Thomas' conviction and sentencing of consecutive Life sentences, in such cases, if considered at all, an offender's youth is generally only considered in passing, as the Life sentence is mandatory and considered for the duration of the defendant's "natural life."[2]

68.     At the time Mr. Thomas was convicted and sentenced to consecutive Life sentences, which are for the duration of his natural life and do not encompass a liberty interest in receiving meaningful and realistic considerations for parole, his youth status and

---

[2]     Recently, in *Stevens v. State*, 2018 OK CR 11, 422 P.3d 741, the Oklahoma Court of Criminal Appeals established that before a defendant may receive sentence of LWOP, a sentencer must first find the defendant "irreparably corrupt and permanently incorrigible" after first considering youth-related characteristics such as: (1) chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences, (2) the incompetencies associated with youth—for example, the inability to deal with police officers or prosecutors or his incapacity to assist his own attorneys, and (3) whether the circumstances suggest possibility of rehabilitation. *Cf.*, *Luna v. State*, 2016 OK CR 27, ¶ 20, 387 P.3d 956, 962.

attendant characteristics were not considered by the court before imposing such sentences in the custody of the DOC for the duration of Mr. Thomas' natural life. Moreover, without a liberty interest in meaningful consideration for parole wherein no due process attaches Mr. Thomas' continues to be subjected to cruel and unusual punishment under Oklahoma's mandatory sentencing scheme.

### C. OKLAHOMA'S PAROLE SCHEME OPERATES AS A SYSTEM OF CLEMENCY THAT FAILS TO AFFORD MR. THOMAS AND THOSE SIMILARLY SITUATED A MEANINGFUL AND REALISTIC OPPORTUNITY FOR RELEASE UPON DEMONSTRATED MATURITY AND REHABILITATION.

#### 1. The Governor's clemency authority is exclusive and devoid of standards.

69.     By Constitutional mandate, only the Governor may grant parole to any individual convicted of a "violent" crime. Okla. Const. Art. VI, § 10; *see also* 57 O.S. §§ 332, 332.16(B) ("The Governor shall be required to review each parole recommendation and shall grant or deny parole for persons convicted of the following crimes:"). Likewise, only the Governor may commute an individual's sentence pursuant to Oklahoma Constitution, Article VI, § 10.

70.     Such grants of parole or commutation are expressly defined as acts of clemency. Okla. Const. Art. VI, § 10 ("The Governor shall communicate to the Legislature, … the person receiving clemency[.]").

71.     The PPB can make recommendations regarding parole, but the Governor has no obligation to consider or to adopt them. *Id.* ("It shall be the duty of the Board to make an impartial investigation and study of applicants for commutations, pardons or paroles, and by majority vote make its recommendations to the Governor of all persons deemed worthy of

clemency."). Similarly, if requested by the Governor, the PPB may make recommendations regarding commutations as it does in cases of parole. 57 O.S., § 332.2(A).[3]

72.     There are no substantive statutory or regulatory factors guiding or limiting the Governor's decision-making regarding parole. Okla. Const. Art. VI, § 10 ("The Governor shall have the power to grant, after conviction and after favorable recommendation by majority vote of the said Board, commutations, pardon and paroles for all offenses, … upon such conditions and with such restrictions and limitations as he may deem proper, subject to such regulations as may be prescribed by law."); *see also Burnett v. Fallin*, 754 Fed. Appx. 696 (10th Cir. 2018) ("Oklahoma's parole system is two tiered, with the [PPB] acting as the initial gatekeeper and the Governor having ultimate authority and responsibility for granting or denying parole relative to whose inmates for whom the [PPB] issues a favorable recommendation.").

73.     Nothing requires the Governor to consider an individual's youth at time of offense in exercising his or her discretion for parole, and all evidence suggests that youth is not a fact considered, given that Mr. Thomas has never even made it past the First Stage "Jacket Review" and is denied due to the "aggravating factors associated with the original crime."

74.     There are no statutory limits or constraints upon the Governor's commutation authority, nor factors that the Governor must consider in deciding such cases.

---

[3]     Pursuant to 57 O.S.Supp.2019, § 332.2, applications for commutations "must be sent to the trial officials," which shall include "1. The current elected judge of the court where the conviction was had; 2. The current elected district attorney of the jurisdiction where the conviction was had; or 3. The chief or head administrative officer of the arresting law enforcement agency."

75.     As is the case for commutations, the Governor is under no obligation to announce the bases upon which he will consider granting or denying parole, and Oklahoma governors have not promulgated or issued any written, publicly available guidance about any such criteria.

76.     In fact, even if a Governor did announce such criteria, he would not be bound by them and would be under no obligation to adhere to them, and could change them at any time without notice or explanation.

77.     Whether the Governor rejects a recommendation for parole or a recommendation for commutation, no explanation or rationale is provided to the individual who has been denied release. Notably, under the unambiguous text of Oklahoma law, the Governor possesses unfettered discretion to deny every parole recommendation for *any* reason whatsoever or for no reason at all. Additionally, there is no process for appeal or review of the Governor's decision in either case.

78.     This statutory framework has remained largely unchanged for at least half a century.

   **2.  PPB policies and practices, combined with the scheme of executive clemency, deny Mr. Thomas and those similarly situated a meaningful and realistic opportunity for release.**

79.     The policies and practices of the PPB exacerbate Oklahoma's unconstitutional parole scheme, which functions as a system of executive clemency rather than parole with respect to those who were juveniles at the time of the commission of their crimes, including Mr. Thomas.

80.     The PPB policies and practices make no distinction between youth and adults, fail to consider adequately the attributes of youth, and in some respects disproportionately penalize those who were youth at the time of the offense, all while fundamentally impeding individuals from vindicating their right to a meaningful and realistic opportunity for release.

81.     The PPB's policies make no distinction between those whose offenses occurred as youth and those whose offenses occurred as adults.

82.     None of the statutory factors to be considered in determining whether an individual is suitable for parole includes explicit consideration of youth at the time of the offense. *See* 57 O.S.Supp.2019, § 332.7. Upon information and belief, Mr. Thomas avers that parole members receive no training pertaining to adolescent psychological development or any other training that would assist members in contextualizing offenses committed by youth in accordance with the findings of *Roper*, *Graham*, *Miller*, and *Montgomery*.

83.     The discretionary parole process in Oklahoma provides no evidentiary rules, no right to obtain expert assistance or testimony, no cross-examination, no compulsory process, or the assistance of counsel, and cannot meet the meaningful requirements under the constitution and enforce *Miller's* concerns. In Oklahoma, for a homicide offender or any offense considered "violent," the parole process is done in two (2) stages. The first stage is a "jacket review" where the majority of offenders are denied.[4] After a review of the statistical data compiled by the PPB, their denials appear based upon commitment offenses because

---

[4]     The jacket review stage is conducted two (2) months **prior** to the date an offender is eligible to be considered for parole. *See* Okla. Admin. Code 515:3-5-2(a). As such, in practice, when Defendant Board denies an offender at the jacket stage, the offender is denied *before* he is eligible to be considered—or denied—for parole.

no requirements must be considered. In the first-stage jacket review, the offender has no right to challenge the accuracy of any information obtained in the PPB's file.

84.    In Oklahoma, the PPB is not required to provide any verbal or written explanation of its decision. PPB policies prohibit individuals from seeking key information in their own files, including recommendations of the sentencing judge, state's attorney, or case manager, PPB member notes, victim statements, and risk assessments. These practices impede individual from vindicating their right to a meaningful and realistic opportunity for release by undermining their ability to prepare for parole hearings, correct inaccurate information in their files and to know what steps they must take to improve their chances for release.

85.    In many instances, offenders have learned only indirectly, through the statements of PPB members in their hearings, that there is critical, damaging and factually erroneous information in their files that is adversely affecting their chances for release.[5]

86.    Moreover, PPB practices penalize Mr. Thomas and others similarly situated by relying on risk assessment tools that assess the individual as if frozen in time upon their arrival to DOC rather than who he or she is at the time of assessment. These tools take no account of Mr. Thomas' maturation over time, accomplishments, or institutional record. Rather, they penalize those whose were youth upon arrival to DOC by assessing them as

---

[5]    State's attorneys are required to provide "Narrative Reports" to the PPB to describe the commission of the offense and any factors which might enhance or diminish the gravity of the offender's conduct. There is no requirement that the information contained therein be supported by any facts or evidence, and State's attorneys have unfettered discretion to speculate, assume, or presume anything they wish to portray to the PPB—*as fact*—without any "check and balance" system in place to challenge the alleged facts. *See* 19 O.S., § 215.39.

they were when they were most risky and too young to have developed factors that the tools deem "protective" against recidivism. By utilizing these tools, the PPB virtually ensures that Mr. Thomas will demonstrate a moderate to high level of risk even when he is thoroughly rehabilitated and presents little or no risk.

87.     The PPB takes the position that its recommendations and communications with the Governor and his staff are privileged, regardless of whether they are recommendations for parole or commutation.

88.     Upon information and belief, at various points during the past two decades Mr. Thomas has been incarcerated, the PPB has been instructed either directly or indirectly to slow down or limit the number of individuals it is recommending for clemency.

### 3. DOC policies automatically deny Mr. Thomas, as well as those similarly situated, rehabilitative opportunities that affect his opportunity for release.

89.     In 1994, the DOC began adopting policies that bar those serving Life sentences from moving below medium security status regardless of the individual's institutional record. The DOC further adopted policies that categorically bar those serving Life sentences, including juveniles, from eligibility for work release and community corrections. These policies have remained in effect without change for the last two decades and continue to govern the classification and access to programs for all juveniles serving Life sentences.

90.     In the DOC, security classifications determine virtually all aspects of an individual's conditions of confinement. An individual's security classification determines which institutions he or she may be housed, the level of restriction upon his or her freedom

of movement, and all aspects of programmatic eligibility, including access to treatment, training, and employment.

91.     From lowest to highest, DOC's security classification levels are Global Positioning Satellite Surveillance Program (GPS), Community Corrections, Minimum, Medium, and Maximum. Typically, classification is assigned upon commitment to the DOC and reviewed every 120 days thereafter. DOC's classification scheme is a score-based system that assigns and increases points based on certain factors to determine at which security level an individual may be safely assigned. To carry out this scheme, DOC uses an "Initial Custody Assessment/Facility Assignment Form" and subsequently reassesses such determinations using a "Custody Assessment Scale."[6]

92.     Yet, because of their differences from adults, juveniles arrive at the DOC more susceptible to being assaulted and preyed upon, and with greater need for supportive programming and for opportunities that will enable them to be rehabilitated. Categorically assigning Mr. Thomas and those serving Life sentences to no lower than medium security, and barring them from any further progression through the DOC system regardless of any

---

[6]     The DOC's custody assessment tools discriminate against male inmates as compared to their female counterparts. The DOC utilizes separate custody assessment tools for male inmates that are more restrictive than that of female counterparts. For example, a male inmate's custody assessment is determined based upon seven categories, while a female inmate is based upon six categories. One such category is the inmate's "Current Age." A male inmate receives four (4) points until he reaches the age of 28. A female counterpart receives only three (3) points if they are 20 years of age or younger and only two (2) points if they are between the ages of 21 to 31. A male inmate who, in all relevant respects, is similarly situated with a female counterpart, and who has committed the same crime, may be assessed at Maximum security while the female inmate will be assessed no higher than Medium. DOC policy does not provide for "Maximum" security placement assessment for females.

individualized determination or merit unlawfully denies them a core component of a meaningful and realistic opportunity for release.

93. As noted above, DOC's security classification assessment automatically scores juveniles serving Life sentences higher by virtue of their mandatory Life sentences. The same is true for DOC's re-classification assessment. Nevertheless, no matter how Mr. Thomas scores on the assessment, DOC's policy demands a mandatory override, such that he is categorically barred from moving below medium security regardless of his record of accomplishment. In this way, DOC's scheme reinforces the inability to attain opportunities for release for juveniles serving Life sentences.

94. Because virtually every aspect of programming is determined by an individual's classification level, DOC's mandatory override and prohibition against movement below medium security prevent Mr. Thomas from progressing through DOC and properly demonstrating his maturity and rehabilitation regardless of individual merit. Similarly, he is severely limited in his ability to demonstrate rehabilitation through the gradual earning of additional privileges and the ability to demonstrate success in lower-security settings.

95. The limited ability to demonstrate rehabilitation is further limited by the DOC's policy regarding transfers. The DOC policies prohibit the lateral transfer of an inmate from one facility to another unless the currently assigned facility lacks the assessed programmatic needs of the inmate, or lacks a court ordered program. Each facility offers a limited number of rehabilitative programs. Once an inmate has completed all programs

offered at the facility he is assigned, he will not be transferred to another facility for the purpose of seeking further rehabilitative programs.

96.     Mr. Thomas has been assigned to the same institution for more than three years, with no hope of transferring to another facility in order to achieve and demonstrate further rehabilitation.

97.     Until the mid-1990's, inmates serving parole-eligible Life sentences routinely received opportunities to demonstrate their rehabilitation by progressing through reduced security levels within the DOC. Progression to minimum and community corrections security classifications, and thus participation in work release and family leave programs, were readily available to those serving Life sentences. Through participation in these programs, they were able to gradually re-establish family and community ties, maintain steady employment within the community, pay taxes, and even volunteer in the community, all while being subjected to regular and random drug testing and other supervision, including psychological evaluations.

98.     Those serving Life sentences demonstrated success in these settings and ability to access programs only available at these statuses, including work release and family leave, were a crucial factor in the assessment of their readiness for parole by the PPB. Parole records from that era repeatedly reference the belief of Board members that individuals require "testing" in such settings, with increasing privileges and access to society, to demonstrate their preparedness to reenter society.

99.     Unlike Oklahoma's prior policies, the current policies force Defendants to make decisions about Mr. Thomas' suitability for release with far less certainty about how he is likely to fare upon release. In this way, Defendants are effectively discouraged from recommending or approving parole for juveniles serving Life sentences as a result of DOC's practices, and as such, Mr. Thomas is deprived of critical opportunities to demonstrate his rehabilitation.

## III.   THE ORIGINS AND EFFECTS OF OKLAHOMA'S SYSTEM OF *DE FACTO* LIFE WITHOUT PAROLE.

100.    Prior to the mid-1990's, the PPB regularly recommended inmates serving Life sentences for release on parole, and Oklahoma Governors were willing to approve theses recommendations. Parole for inmates serving Life sentences varied by Governor and was still subject to the political machinations of any particular Governor. Nonetheless, parole was a meaningful and realistic availability for inmates serving Life sentences who demonstrated their rehabilitation, particularly through being successful as they progressed through increasingly less restrictive security levels of the DOC.

101.    Inmates serving Life sentences in the custody of the DOC were routinely provided opportunities to obtain less restrictive supervision by working their way towards community corrections assignments, work release, and earn unsupervised conditions by obtaining weekend furloughs where they were regularly allowed freedom to travel.

102.    Oklahoma's parole system changed dramatically in 1995, when then-Governor Frank Keating announced that individuals serving Life sentences—no matter their level of demonstrated maturity or rehabilitation efforts and no matter how many years they had

served or how young they might have been at the time of offense—would no longer be allowed to progress below medium security.

103.    As a consequence of this broad band on progression below medium security for those serving Life sentences, the number of recommendations for parole by the PPB—and subsequent grants by the Governor—plummeted drastically. Parole for inmates serving Life sentences has largely remained without meaningful or realistic opportunities ever since.

104.    While the opinion specifically referenced Oklahoma's commutation process, the Oklahoma Court of Criminal Appeals ("OCCA") dictum concerning Oklahoma's system of executive clemency in the juvenile case of *Luna v. State*, 2016 OK CR 27, 387 P.3d 956 ("Luna"), is informative. The OCCA stated that the executive clemency process in Oklahoma "cannot meaningfully enforce *Miller's* prohibition" because it is "a procedure largely without evidentiary rules, with no right to obtain expert assistance or testimony, no cross-examination, compulsory process, or the assistance of counsel" *Luna*, 2016 OK CR at ¶ 21. Thus, while a sentence of life in Oklahoma provides a juvenile with an opportunity, or "mere hope" of release through the parole process, the OCCA recognizes that an "opportunity" alone in itself is not enough to satisfy the "meaningful and realistic" component. *See also Jackson v. Standifird*, 503 Fed. Appx. 623, 625-626 (10th Cir. 2012) (quoting *Shirley v. Chestnut*, 603 F.2d 805, 807 (10th Cir. 1979)).

105.    Similarly, in *Hunter v. Beck*, 244 Fed. Appx. 848 (10th Cir. 2007) ("*Hunter*") the Tenth Circuit Court of Appeals determined that simply because "the state holds out the possibility of parole [it] provides no more than a mere hope that the benefit will be

obtained." *Hunter*, 244 Fed. Appx. at 851-852 (quoting *Greenholtz v. Nebraska Penal & Correctional Complex*, 442 U.S. 1, 11 (1979)).

106.    These cases further establish that Oklahoma Governors and the PPB have unfettered discretion to grant or deny parole for any reason, without explanation, and without any opportunity for review, and as such, Oklahoma's parole process does not afford juvenile defendants with a meaningful and realistic opportunity to obtain release based upon demonstrated maturity and rehabilitation.

## IV.   MR. THOMAS' RIGHTS HAVE BEEN VIOLATED AND HE SUFFERS GRAVE HARMS AS A RESULT OF OKLAHOMA'S SYSTEM OF *DE FACTO* LIFE WITHOUT PAROLE.

107.    As a result of the policies and practices of Defendants, and illustrated by their refusal to recommend parole—or proceed past the first stage "Jacket Review"—because of the "aggravating factors associated with the original crime," Mr. Thomas has consistently been denied any meaningful and realistic opportunity to obtain release based on demonstrated maturity and rehabilitation. Mr. Thomas, as well as every inmate within the DOC, has come to regard parole proceedings as futile and meaningless, and the idea of parole as completely illusory. No matter how well he may behave, how consistently he may demonstrate his trustworthiness, or how much he matures, he can never progress below medium security to lesser classifications that will allow him to demonstrate further his readiness for release. Similarly, the risk assessment tools utilized penalize Mr. Thomas and others similarly situated for their youthfulness at the time of their offense and totally fail to consider their institutional history and record of accomplishment since incarceration. As such, Mr. Thomas has suffered, and continues to suffer, violation of his rights under the

Eighth Amendment to the U.S. Constitution and Article II, § 9 of the Oklahoma Constitution.

108.   Mr. Thomas was a juvenile at the time the offenses were committed and sentenced to consecutive terms of imprisonment for Life, where these sentences guarantee death behind bars for crimes allegedly committed as a child under Oklahoma's mandatory sentencing scheme and without adequate consideration of his youth status, for his role in Murder that occurred in 1995, when he was fifteen (15) years old, and decades later is being deprived of a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation, in contravention of his federal constitutional rights.

109.   Mr. Thomas is now thirty-nine (39) years old. He has spent twenty-five (25) years, more than two-thirds of his lifetime, incarcerated for this offense.

110.   Mr. Thomas was sentenced to Life in prison under Oklahoma's mandatory sentencing scheme for Murder. Nothing in Mr. Thomas' record suggests, nor was any finding ever made, that his crime reflected that he was among the "rarest juvenile[s] whose crime reflects permanent incorrigibility."

111.   In recognition of Mr. Thomas' record, at each of his parole consideration dates the parole investigator gave favorable recommendations to the PPB. Also at each of his parole consideration dates, the PPB rejected the parole investigator's favorable recommendations and denied Mr. Thomas at the first "jacket review" stage, which, as previously stated, **occurs two (2) months *prior* to Mr. Thomas' eligibility to be considered (or denied) for parole.**

112.    Even if the PPB were to recommend Mr. Thomas for release, whether on parole or for a commutation, the governor who receives such a recommendation can reject it for any reason without explanation and without any opportunity for review.

113.    When Mr. Thomas first arrived in the DOC, he had no prior record. Yet, because he was serving a Life sentence, and because of his young age, he was automatically designated as "maximum" security and sent to the Oklahoma State Penitentiary in spite of his youth.

114.    Year after year, DOC classification counselors assessing Mr. Thomas' readiness for parole have noted his "excellent" record and observed that the only issue hindering his release is the State's parole system. For nearly two decades, Mr. Thomas has been identified as a strong candidate for progression to lesser security but has been denied this opportunity solely because of his sentence of Life and without regard for his youth and its attendant characteristics at the time of offense.

115.    Every one-hundred-and-twenty (120) days, the DOC conducts a Custody Assessment Scale ("CAS") for Mr. Thomas. This custody assessment tool relied upon by DOC has six sections (Sections A through F). Section B is used to determine Mr. Thomas' "comprehensive custody" score (i.e., the total number of "security" points). Section C is used to determine Mr. Thomas' "assessed custody level" (i.e., the assessed custody level based upon the "comprehensive custody" score). While DOC completes Section B when conducting Mr. Thomas' CAS, regardless of what custody level his "comprehensive custody" score may reflect, Mr. Thomas is categorically prohibited from moving below medium security because he is serving a Life sentence.

116.   Upon information and belief, DOC's comprehensive custody score demonstrates that, due to Mr. Thomas' institutional record and steady employment within DOC, he can safely be moved to a lower security level, where he would be able to demonstrate further his rehabilitation and maturity by participation in community corrections, work release, and family leave programs. The mandatory override denies Mr. Thomas the ability to make this progression.

117.   Also occurring every 120 days, the DOC conducts an "Adjustment Review" for Mr. Thomas. This Adjustment Review relied upon by DOC is to formally review and evaluate Mr. Thomas' adjustment, behavior, assigned level, and program participation. The Adjustment Review informs Mr. Thomas of his classification, system of incarceration level, and his "current patterns of behavior."

118.   The "current patterns of behavior" section of the Adjustment Review evaluates and rates several areas of Mr. Thomas' behavior. Among these areas are relationships with staff, participation in assigned programs, job performance, relationships with other inmates, maintenance of personal hygiene, maintenance of living quarters, and program job performance. Throughout the past two decades, Mr. Thomas' case managers have given him above satisfactory (*e.g.*, "Outstanding" or "Excellent") ratings in all areas of his current patterns of behavior.

119.   Mr. Thomas has been denied, and continues to be denied, a meaningful and realistic opportunity for release, in that (i) he is unable to move below medium security regardless of how impeccable an institutional record he achieves, and thus he is barred from developing skills that allow him to demonstrate his rehabilitation; (ii) he is denied any

explanation for what additional steps he must take to be recommended for parole; (iii) he has been discriminated against with respect to his opportunities for rehabilitation and release by Defendants' use of risk assessment tools that hold his youth at time of offense against him; (iv) he is subjected to a parole system that operates no differently than a system of executive clemency; and (v) he is subjected to parole practices that penalize him for his offense, as well as for his young age at the time of his offense.

## CAUSES OF ACTION

## COUNT ONE

### VIOLATION OF THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT AND 42 U.S.C. § 1983
(Mr. Thomas Against all Defendants)

120.    Mr. Thomas re-alleges paragraphs 1 to 119 and incorporates them as if fully stated herein.

121.    The Eighth Amendment forbids a statutory scheme that mandates Life imprisonment for juveniles or permits Life sentences for juveniles in non-homicide cases without adequate regard for their status as minors, and then denies them a meaningful opportunity for release upon demonstrated maturity and rehabilitation. A meaningful opportunity for release includes the opportunity to demonstrate rehabilitation.

122.    Defendants operate a parole scheme that is indistinguishable from a system of *ad hoc* executive clemency in which grants of release are exceptionally rare, are governed by no substantive or enforceable standards, and are masked from view of those affected by assertions of executive privilege.

123.   Oklahoma's system of arbitrary, *ad hoc* executive clemency, as applied to Mr. Thomas, has not afforded him a meaningful and realistic opportunity for release, in violation of the Eighth Amendment.

124.   Moreover, the PPB's application here of risk assessment tools that discriminate against youth has denied Mr. Thomas a meaningful and realistic opportunity for release upon a showing of rehabilitation, in violation of the Eighth Amendment.

125.   The DOC's practice of automatically classifying all those sentenced to Life, including juveniles such as Mr. Thomas, as no lower than medium security denies Mr. Thomas critical rehabilitative opportunities that are essential to his ability to demonstrate maturity and rehabilitation.

126.   Mr. Thomas has been injured by Defendants' policies and practices by being denied his right to a meaningful opportunity for release from imprisonment notwithstanding his youth at the time of his offense and despite his demonstration of rehabilitation, in violation of the Eighth Amendment, giving rise to his claims for relief under 42 U.S.C. § 1983.

## COUNT TWO

### VIOLATION OF ARTICLE II, SECTION 9, OKLAHOMA CONSTITUTION'S PROHIBITION AGAINST CRUEL OR UNUSUAL PUNISHMENT
(Mr. Thomas Against all Defendants)

127.   Mr. Thomas re-alleges paragraphs 1 to 119 and incorporates them as if fully stated herein.

128.   Article II, § 9 of the Oklahoma Constitution forbids a system that mandates life imprisonment for juveniles without adequate regard for their status as minors, and then

denies them a realistic and meaningful opportunity for release. A meaningful opportunity for release includes the opportunity to demonstrate maturity and rehabilitation.

129.    Defendants operate a parole scheme that is indistinguishable from a system of *ad hoc* executive clemency in which grants of release are *exceptionally* rare, are governed by no substantive or enforceable standards wherein even a miniscule amount of due process attaches, and are masked from view of those affected by assertions of executive privilege.

130.    Oklahoma's system of arbitrary, *ad hoc* executive clemency, as applied to Mr. Thomas, has not afforded him a meaningful and realistic opportunity for release upon demonstrated maturity and rehabilitation, in violation of Article II, § 9.

131.    Moreover, the PPB's application here of risk assessment tools that discriminate against youth has denied Mr. Thomas a meaningful and realistic opportunity for release upon a showing of rehabilitation, in violation of Article II, § 9.

132.    The DOC's practice of automatically classifying all those sentenced to Life, including juveniles such as Mr. Thomas, as no lower than medium security denies Mr. Thomas critical rehabilitative opportunities that are essential to his ability to demonstrate maturity and rehabilitation.

133.    Mr. Thomas has been injured by Defendants' policies and practices by being denied his right to a meaningful opportunity for release from imprisonment notwithstanding his youth at the time of his offense and despite his demonstration of maturity and rehabilitation, in violation of the Eighth Amendment to the U.S. Constitution, and Article II, § 9 of the Oklahoma Constitution.

**COUNT THREE**

**FOR DECLARATORY JUDGMENT THAT OKLAHOMA STATUTE TITLE 57, SECTION 332.7 IS UNCONSTITUTIONAL**
(Mr. Thomas Against all Defendants)

134.    Mr. Thomas re-alleges paragraphs 1 to 119 and incorporates them as if fully stated herein.

135.    The Eighth Amendment to the U.S. Constitution requires youth status to be considered and a finding of "irreparable corruption" before youth may be sentenced to Life **without** a meaningful opportunity for release.

136.    Section 332.7 violates the prohibition against cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution because § 332.7 mandates that the PPB considers for parole individuals sentenced to Life irrespective of any consideration of the youth status of the offender.

137.    Mr. Thomas has been injured by parole consideration pursuant to § 332.7 by being denied adequate consideration of his youth before being denied parole without a meaningful and realistic opportunity for release upon his demonstrated maturity and rehabilitation, in violation of the Eighth Amendment to the U.S. Constitution, and Article II, § 9 of the Oklahoma Constitution.

**PRAYER FOR RELIEF**

**WHEREFORE**, Mr. Thomas requests that this Court:

(a) Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants have operated, and continue to operate, a parole scheme that denies individuals, such as Mr. Thomas, who are serving parole-eligible Life sentences for offenses committed as a juvenile, a meaningful and realistic opportunity for release, in violation of the prohibition against

cruel and unusual punishment in the Eighth Amendment to the U.S. Constitution and the prohibition against cruel or unusual punishment in Article II, § 9 of the Oklahoma Constitution;

(b) Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Mr. Thomas is serving *de facto* LWOP sentences pursuant to which he has not been afforded any meaningful or realistic opportunity for release, in violation of the prohibition against cruel and unusual punishment in the Eighth Amendment to the U.S. Constitution and the prohibition against cruel or unusual punishment in Article II, § 9 of the Oklahoma Constitution;

(c) Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Article VI, § 10 of the Oklahoma Constitution, granting the Governor the exclusive authority to parole an individual serving a parole-eligible Life sentence, is unconstitutional as applied to individuals, including Mr. Thomas, whom were juveniles at the time of their offenses;

(d) Declare, pursuant to 28 U.S.C. §§ 2201-2202, that 57 O.S., § 332, granting the Governor the exclusive authority to parole an individual serving a parole-eligible Life sentence, and is unconstitutional as applied to individuals, including Mr. Thomas, whom were juveniles at the time of their offenses;

(e) Declare, pursuant to 28 U.S.C. §§ 2201-2202, that 57 O.S., § 332.16(B), granting the Governor the exclusive authority to parole an individual serving a parole-eligible Life sentence, is unconstitutional as applied to individuals, including Mr. Thomas, whom were juveniles at the time of their offenses

(f) Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants' reliance upon risk assessment tools that discriminate against those who were juveniles at the time of offense to assess opportunities for release has denied Mr. Thomas a meaningful and realistic opportunity for release upon a showing of rehabilitation, in violation of the Eighth Amendment;

(g) Declare, pursuant to 28 U.S.C. §§ 2201-2202, that, at least since 1995, Defendants have denied Mr. Thomas, including those similarly situated, a meaningful and realistic opportunity for release by denying him access to critical rehabilitative opportunities through policies and practices automatically classifying him as no lower than medium security and prohibiting him from progressing to security levels below medium regardless of individual merit, in violation of the prohibition against cruel and unusual punishment in the Eighth Amendment to the U.S. Constitution and the prohibition against cruel or unusual punishment in Article II, § 9 of the Oklahoma Constitution;

(h) Enjoin Defendants immediately to discontinue these practices and to take remedial steps to address their past illegal conduct, by granting Mr. Thomas, and those similarly situated, a meaningful and realistic opportunity to demonstrate his readiness for release; and

(i) Grant such other and further relief as the Court may deem just and proper.

I declare under penalty of perjury, as required by 28 U.S.C. § 1746, that I am familiar with the contents herein and the foregoing statements, based upon information and belief, are true and correct.

Dated: September 15, 2020.

Submitted,

Dwain Thomas, #253218
129 Conner Rd.
Hominy, OK 74035
(918) 594-1300

*Plaintiff Pro se*

-41-

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of September 2020, I filed the attached **Civil Complaint for Declaratory and Injunctive Relief** with the Clerk of the Court, whom served the attached document along with Summons, on:

**Kevin Stitt, Governor**
**2300 N. Lincoln Blvd., Ste 212**
**Oklahoma City, OK 73105**

**Steven Bickley, Executive Director**
**Oklahoma Pardon and Parole Board**
**2915 N. Classen Blvd., Ste. 405**
**Oklahoma City, OK 73106**

**T. Hastings Siegfried, Chair**
**Oklahoma Board of Corrections**
**3400 N. Martin Luther King Ave.**
**Oklahoma City, OK 73111**

**Scott Crow, Director**
**Oklahoma Department of Corrections**
**3400 N. Martin Luther King Ave.**
**Oklahoma City, OK 73111**

*Defendants*

by certified mail, return receipt requested and delivery restricted to the addressee, via deposit in the internal legal mail system at the Dick Conner Correctional Center.

Dwain Thomas, #253218
129 Conner Rd.
Hominy, OK 74035
(918) 594-1300
*Plaintiff Pro se*